On the 8th day of February, 1898, William Dalton, then commissioner of water supply, pursuant to the authority conferred upon him by that section, established and organized two bureaus of the department of water supply, and only two, and evidenced his action by a written order to that effect, filed with the department, and now in the custody and control of the department of water supply, gas, and electricity. These two bureaus were, first, the bureau of civil engineer, and, second, the bureau for the collection of revenue derived from the sale and use of water in the city of New York, the chief officer of which, Commissioner Dalton ordered, should be known as "water registrar"; and the direction further provided that a branch office of the latter bureau be maintained in the Municipal Building in the borough of Brooklyn. This direction was so closely in accord with the provisions and requirements of section 458 of the charter of 1897 that it seems to be clear without argument that the Brooklyn office was, in the language of the section, a branch of the bureau so organized by him, and located, as the act required, in the public hall or building in the borough of Brooklyn. The head of the bureau was the chief officer thereof, and was known as the "water registrar." His subordinate for the branch of the bureau in Brooklyn held the position as water registrar for the borough of Brooklyn, and was not, therefore, the head of a bureau. In view of the statutory authority vested in the commissioner to establish such bureaus as he might see fit, and in view of the fact that he has established no more than two, and made the office at the head of which the relator was placed distinctly a branch of one of those bureaus, it cannot be said, in the absence of some further direction in the premises, that under the authority conferred upon the commissioner by section 458 of the charter of 1897 there has been by custom, usage, or in any other way established any other or further "bureau," as that term is understood in section 1543, the advantage of whose terms the relator seeks. It follows that the granting of a writ of mandamus in this case, either alternative or peremptory, is improper, and the order appealed from must therefore be reversed.

Order allowing alternative writ of mandamus reversed, with $10 costs and disbursements, and writ dismissed. All concur.

<hr />

## MARTIN v. PRESS PUB. CO.

(Supreme Court, Appellate Division, Second Department. April 22, 1904.)

1. LIBEL—INNUENDOES—DISREGARD BY COURT.

　　Where by innuendo or allegations of that nature the plaintiff has put meanings upon the alleged libelous publication unsupported by its language, the court may, if the article is libelous per se, disregard the innuendoes, and submit the case to the jury.

2. SAME—ARTICLES LIBELOUS PER SE.

　　A publication concerning one who has had every advantage of education, and possesses extraordinary attainments in classical learning, that he is poverty stricken, and cannot afford to put doors and windows into

¶ 1. See Libel and Slander, vol. 32, Cent. Dig. § 208.

his house, and that he is starving because of being overeducated, holds him up before the public as ridiculous, tends to alter his station in society for the worse, and is libelous per se.

Bartlett and Jenks, JJ., dissenting.

Appeal from Special Term, Kings County.

Action by Alfred Nolan Martin against the Press Publishing Company. From a judgment for defendant, and from an order denying a new trial (83 N. Y. Supp. 119), plaintiff appeals. Reversed.

Argued before HIRSCHBERG, P. J., and BARTLETT, WOODWARD, JENKS, and HOOKER, JJ.

Ira Leo Bamberger (Saul S. Myers, on the brief), for appellant.
James W. Gerard (Manfred W. Ehrich, on the brief), for respondent.

HOOKER, J.   The plaintiff has sued for damages on account of the alleged malicious publication in the defendant's newspaper of the following article:

"Savant Cannot Make a Living. Old Oxford Professor and Family in Sad Straits. That the battle for existence is not won by brains alone is illustrated in the sad plight of Prof. Alfred Nolan Martin, at Richmond Park, Staten Island. A man of extraordinary attainments in classical learning, and once a professor in Oxford University, he is now in sad straits because his education hampers him in earning a living. He is living with his young wife and two small children in a house which has not a single door or window inclosed. He is too poor to finish his dwelling and too proud to ask aid. His neighbors say he is starving. In his life—he is now over fifty—Prof. Martin has been, besides an Oxford professor, a sanitary engineer, a lecturer, a social agitator, a school teacher, and author. Seven years ago, while with the Staten Island Health Department, he married Miss Cooper, of Stapleton, a graduate of the New York University Law School. Then he lost his place."

Upon the trial, before any evidence was taken, the defendant moved to dismiss the complaint on the ground that it did not state facts to constitute a cause of action. This motion was granted, and plaintiff appeals from the judgment entered thereon, and from the order denying his motion for a new trial. In denying the motion for a new trial the learned court below wrote an opinion in which he reached the conclusion that the published words were not susceptible of the particular meanings alleged in the complaint to be attributable to them, and held that therefore the complaint did not state a cause of action. Since the writing of that opinion, the Court of Appeals has decided the case of Morrison v. Smith, 177 N. Y. 366, 69 N. E. 725, in which the recent cases in the Appellate Division, upon which the court below relied in his disposition of the motion (Brown v. Tribune Association, 74 App. Div. 359, 77 App. Div. 461, Morse v. Press Pub. Co., 49 App. Div. 375, 63 N. Y. Supp. 423, and Morrison v. Smith, 83 App. Div. 206, 82 N. Y. Supp. 166), were distinctly overruled, and it is now the established law in this state, by reason of the recent utterance of the court of last resort, that where, by innuendo or allegations of that nature, the plaintiff has put meanings upon the alleged libelous publication unsupported by its language, the court may nevertheless, if the article is libelous per se, submit the case to the jury. The question therefore presented for our consideration is whether the article which we have quoted is libelous per se. If the question is answered in the affirmative, the

judgment and order must be reversed, for the innuendoes and allegations of the complaint as to the meaning to be attached to its phrases and sentences may be disregarded.

Somewhat more recent cases in the Court of Appeals upon the subject of what constitutes libel per se are Morey v. M. J. Association, 123 N. Y. 207, 25 N. E. 161, 9 L. R. A. 621, 20 Am. St. Rep. 730; Moore v. Francis, 121 N. Y. 199, 23 N. E. 1127, 8 L. R. A. 214, 18 Am. St. Rep. 810; Shelby v. Sun Printing & Pub. Association, 38 Hun, 474, affirmed on opinion below in 109 N. Y. 611, 15 N. E. 895. It is in those cases declared that, if the tendency of a written or published article is to disgrace the plaintiff or bring him into ridicule or contempt, the matter is libelous per se. The case of Cropp v. Tilney, 3 Salk. 225, is cited twice with approval as holding that scandalous matter was not necessary to make the libel, it being enough if it induced an ill opinion to be had of the plaintiff, or make him contemptible and rediculous. It is declared that the publishing of anything concerning another, which tends to hinder mankind from associating or having intercourse with him is actionable. The language of Starkie on Slander is quoted with approval where it is said that for any false, malicious, and personal implication "tending to alter a party's station in society for the worse by imputing to him either bad actions or vicious principles, or which diminish his respectability and abridge his comforts by exposing him to disgrace and ridicule," an action will lie. We think that the words published of the plaintiff in this case are well within the rule to which we have called attention. The publishing of one who has had every advantage of education and possesses extraordinary attainments in classical learning that he is poverty stricken, that he cannot afford to put doors and windows into his unfinished house, and that he is starving, all because of being overeducated, holds him up before the public as ridiculous, and tends to abridge his comfort by exposing him to ridicule. Their tendency is to alter his station in society for the worse. This is evidently the view which the late First Department of the General Term took of an article alleged to have been libelous per se, published by the defendant, in Moffatt v. Cauldwell, 3 Hun, 26. There the plaintiff was described as having been reduced from affluence to poverty, and "journalistic color," so called, was injected into the article. Mr. Justice Barrett, speaking for the court, said this:

"As an abstract generality, it is true that mere poverty ought not to expose any citizen to ridicule. But the proposition that ridicule is a non sequitur from such an imputation is not universally true. One may be so circumstanced, and the fact of his alleged misery may be so put, as to excite ridicule and nothing else. Take, for instance, the case of any well-known citizen of wealth. Assume his retirement from business, so as to eliminate all questions of mercantile credit. While he is still occupying a comfortable house, and perhaps entertaining in a hospitable manner, a sensational account of his misfortune appears in a public journal, stating, as in the present case, that he 'breathes,' but scarcely 'lives,' in a 'garret'; that he manages, by constantly sewing for a tailor, to eke out a 'scanty pittance' and a wretched life; that for years he has lived by the sale of his personal effects, saved from the general wreck; and other minute details. Can it be doubted that such a 'sensation,' taken in its length and breadth, and under such circumstances, would tend to expose the person in question to ridicule? Again, neither is wealth a crime. Yet a poor man may be held up to ridicule by a false and malicious account of his sudden, though perfectly honest, acquisition of fortune, coupled with

an elaborate and highly-colored picture of his luxurious life and splendid entertainments. It comes to this: Whether or no the matter was libelous, so as to be actionable, depends upon the style, scope, spirit, and motive of every such publication, taken in its entirety. The inquiry is, then, into the natural effect of the publication, not only upon the general public, but upon the neighbors and friends of the person aimed at."

The Appellate Division of the First Department, in Battersby v. Collier, 24 App. Div. 89, 48 N. Y. Supp. 976, has said that "the imputation of poverty and squalor and alleged misery may be so put as to excite ridicule, and so amount to defamation"; citing the Moffatt Case. See Am. & Eng. Ency. of Law (2d Ed.) vol. 18, p. 913. The facts are well within the principle of these cases, and within the general definitions upon the subject.

The judgment and order must be reversed.

Judgment and order reversed, and new trial granted; costs to abide the event. All concur, except BARTLETT and JENKS, JJ., who dissent.